ORLEANS NAVIGATION COMPANY

vs.

THE MAYOR, &c. OF NEW-ORLEANS. *Vol.* 1. 269.

Whether the city of New-Orleans may drain its waters in the Canal Carondelet?

THE Court having been divided, on the first argument of this case, their attention was again drawn to it.

BY consent, three paragraphs of the *Moniteur de la Louisiane*, a paper printed under the eye of the Baron de Carondelet, were read in evidence. They were allowed to be official.

I. THE first is in No. 13, dated May 24, 1794, it announces the project of *a canal, which, carrying the waters of the city and its environs into one of the branches of the Bayou St. John, will rid it of the stagnating waters which contribute in a great degree to its insalubrity and the vast quantities of musquitoes which render it so unpleasant in summer.*

IT farther states that the war precluding the hope that the royal treasury would contribute to the expense of *a considerable canal of navigation,* Government had only solicited H. M. to allow the convicts (who were about to be sent to Pensacola) to remain in New-Orleans, engaging with them and the help of zealous inhabitants to cut A DRAIN *which* IN SUCCESSIVE YEARS *will be* CHANGED *into* A CANAL OF NAVIGATION FOR SCHOONERS

THE paper states lastly that government having obtained this FAVOUR *(grâce)* intended, in the course of the month of June, to ask of the

inhabitants of the city such number of negroes as they could spare to cut down the trees.

FALL, 1810
First District.

ORLEANS
NAVIGATION
COMPANY

MAYOR, &c. of
NEW-ORLEANS

Two large banquettes are spoken of, which, when planted with rows of trees will afford *an agreable promenade.*

II. THE second paragraph is of the 19th of Oct. 1795, No. 60. It brings to view the future greatness of the city—its encreasing commerce and presses the necessity of opening a communication with the sea thro' the lakes.

IT contains an official letter alluding to the great advantages the citizens had experienced the facility with which they had been supplied with wood, and the marked diminution of mortality which prevailed in September and October hitherto and the disgorgement of the waters which originated behind the city. The governor then presses the commissaries to prevail on the citizens to continue their aid to hasten the complete advantage contemplated by facilitating the navigation. The Baron expresses his hopes that if the planters also lend their aid, schooners will soon be able to come to the city.

A draw-bridge on the Bayou to be built *at the expense of the city* is announced.

THE intended *promenade* is again brought to view.

III. THE third paragraph is of the 23d of Nov. No. 72. It notices the completion of the *canal of the City* as far as the bayou, with a width of 15 feet, and mentions they are deepening it one foot

FALL, 1811.
First District.

ORLEANS
NAVIGATION
COMPANY
*vs.*
MAYOR, &c. OF
NEW-ORLEANS.

farther from the high lands of the Lepers, so as to enable schooners to come to the city: a work which it is said will be completed in eight days if the planters and citizens will lend one negro each for three days—" a service of little moment which, " however will *rid them* TOTALLY *of the stag-* " *nating waters and consequently of the sickness* " *common in the fall*—while it will allow the " completion of the port for schooners already " began—for without this deepening, schooners " will be able to come up to the city."

A royal schedule of the 10th of May 1801 was also read. *See the contents of it, vol.* 1, p. 271 & 272.

A number of witnesses were next examined.

*Boré* deposed that the canal was dug for the salubrity of the city ; an object which was expected to be attained by conveying the waters of the city and the commons through the canal. The inhabitants furnished their negroes cheerfully. He dwelt at the distance of five miles from the city and sent his gang.

*Metzinger* deposed that he was one of the aids-de-camp of the Baron de Carondelet, and began the canal with sixty negroes, supplied by the inhabitants of the city. It was originally only six feet wide and turned round the large trees ; the object of it being the conveyance of the waters of the city to the bayou. In the second

FÁLL, 1811.
First District.

ORLEANS
NAVIGATION
COMPANY
vs.
MAYOR. &C. OR
NEW-ORLEANS.

year, the canal was widened and the work carried on with the negroes furnished by their owners: such individuals, as had none, working themselves or furnishing an equivalent in money. The number of negroes thus employed was on an average, after the first year, from 160 to 175. The *presidios* or convicts were about the same number; but worked only when there was no employment for them elsewhere. The negroes dug and the convicts carried away the dirt. In his judgment the convicts did not do one fourth of the work. The negroes were fed by government, and went to their masters at night. The waters of the city began to run into the canal soon after its completion. The witness observing that in heavy rains, these waters brought so much dirt that the canal would soon be filled up, he represented this circumstance to the Baron, who replied the canal was dug for the conveyance of the waters of the city, as well as for the purpose of navigation, and must answer both the intended objects. The Baron had three large wooden gutters placed on each side of the canal, the issues of which were stopped up, in time of rain, and opened, after the water had deposited its sediment, to let it, thus clear, find its way through the canal. A keeper was appointed for this service.

*Lavigne* deposed that he has lived fifteen years near the canal, and lives there at this moment— has always observed the waters of the city to

FALL, 1811.
First District.

ORLEANS
NAVIGATION
COMPANY
*vs.*
MAYOR, &c. OF
NEW-ORLEANS.

run into the fortification ditch, and from thence into the canal. The waters of the commons found their way into it, through gutters with flood-gates.

*Bretonnier* deposed he was employed by the Baron to solicit his neighbours to send their negroes to work on the canal: He does not believe any of them would have sent any, if they had believed the object of it was not for the benefit of the city. The waters of it have ran into the canal since it exists. Before, they spread on the commons. The spot, on which the canal is, was the lowest; not so much however as to prevent the spreading of the water along the sides, but in heavy rains a sensible current appeared in the present direction of the canal. The canal was always used for the purpose of a drain and that of navigation. It filled up, after attention ceased to be paid to the trunks or *gargouilles*.

*Castanedo* deposed he was the treasurer of the city, when the Baron began the canal. His avowed object was to relieve the city from the great mortality which was occasioned by a quantity of putrid water, which lodged on the commons. The inhabitants cheerfully yielded their negroes; he sent his. When the convicts were not at work on the fortifications they were sent to the canal. The Baron intended to have the canal thirty feet wide, double its present width, and four feet deep, and to have a *marie salope* or drag to keep it from filling up. The King's engineer had repor-

FALL, 1811.
First District.

ORLEANS
NAVIGATION
COMPANY
*vs.*
MAYOR, &c. OF
NEW-ORLEANS.

ted this could be done. The general opinion of the people was that the canal would answer the purposes of a drain and of navigation. After the canal was dug the city built a draw-bridge on the bayou at its expence.

*Tanesse*, the city surveyor, deposed that the declivity of the land from the bayou road to the canal is thirteen inches; less than one inch on the hundred feet. The natural course of the water was originally on the spot on which the canal has been dug. This is still perceivable. He believes that the present declivity, which now renders a spot, before the middle of the square, between Maine and St. Philippe streets, the lowest part between the road and the canal, is artificial. The water, falling on the opposite or left side of the canal, naturally runs into it. If the water of the city were conveyed to the bayou, by a new drain they would fill the bayou up, as they now fill the canal.

The navigation of the bayou is now obstructed from the mouth of the canal to the draw-bridge, because the canal has not been kept clean. If the canal was dug about four feet deep it could bear a *marie salope* or drag and would drain the city and answer the purpose of navigation.

*Dorville* deposed he has long lived near the bayou, the canal was at first intended as a drain.

*Latour*, an engineer, deposed that water will run on a slope of a line in the toise. If the ground be uneven more is required. He gene-

FALL, 1811.
First District.

ORLEANS
NAVIGATION
COMPANY
*vs.*
MAYOR, &c OF
NEW-ORLEANS

rally gives one inch to the toise. He has never noticed any obstruction in the bayou near the mouth of the canal. He cannot however affirm that none exists.

*Livingston*, for the plaintiffs. The plaintiffs claim the right of entering upon and clearing the canal Carondelet, under their act of incorporation. July 3, 1805, chap. 1.

THE 7th section authorises them to enter into and upon all and singular the land and lands covered with water where they shall deem it proper to carry the canals and navigation herein particularly assigned.

THE 9th section authorises them to receive certain tolls when the improvements made by them shall permit vessels drawing three feet water to pass from the Bayou St. John, by the canal Carondelet, to the basin terminating the same at the city ditch.

THIS grant, however, being made by the Legislative Council, would have been void, as that body had no right to dispose of the land which had passed to the United States by the cession: but it has received the sanction of Congress. The governor was directed to transmit the acts of the Legislative Council to Congress, who had reserved the right of repealing them. Congress, not having exercised that right, must therefore be considered as having approved the act of incorporation. If a farther sanction be necessary,

FALL, 1811.
First District.

ORLEANS
NAVIGATION
COMPANY
vs
MAYOR, &c. OF
NEW-ORLEANS.

the plaintiffs have it in the act of Congress, (1807, c. 31,) the 3d section of which imposes on the corporation of the city the obligation of convey-ing to the plaintiffs as much of the commons of the city as shall be necessary to continue the ca-nal Carondelet to the Mississippi, as a condition of the recognition of the title of the city to part of the commons. To this the defendants have assented by accepting the grant and making the conveyance.

THE defendants have also impliedly recogni-sed the validity of the plaintiffs' charter, by ta-king the shares which were reserved for their benefit.

THE plaintiffs have therefore validly acquired the rights which the defendants had in the soil before the charter : but it is contended that ad-mitting that the defendants have thus lost their right in the soil, still they have a servitude therein.

SERVITUDES may be acquired by nature, by grant or convention, lastly by prescription.

I. As the present canal is an artificial work; it cannot be contended that nature gave any right therein. Neither, in my apprehension, have the defendants shewn any right of servitude to have existed, before the digging of the canal.

THE defendants, however, claim one from the situation of the ground : the city being natural-ly higher, must drain its waters, on the ground in the back of it. But it is in evidence that the

C

FALL, 1811.
First District.

ORLEANS
NAVIGATION
COMPANY
*vs.*
MAYOR, &c. OF
NEW-ORLEANS.

natural drain is between St. Phillip and Maine streets, at a considerable distance from the canal.

II. SERVITUDES are also acquired by grant or convention. In the present case, it is admitted that the land was originally the property of the sovereign. In order therefore to establish an adverse right, a grant must be produced or a convention or agreement clearly proved.

THE defendants do not pretend that they possess any formal grant, but claim the servitude under an agreement and convention which took place between the sovereign, represented by his governor, the Baron de Carondelet, on the one part and certain inhabitants of the city of New-Orleans and its vicinity, on the other.

THE evidence of this agreement and convention has been preserved in certain paragraphs of the *Moniteur de la Louisiane.*

THE Baron there solicits the aid of a few negroes for the digging of a canal, which at first is to serve as a drain to the waters of the city; but at the same time, he declares that the canal is only to be destined to this object for a short time; it is afterwards to be *changed* into a canal of navigation. If the canal was to undergo a *change,* it is absurd to say it was to continue after, what it was before it. If the canal was intended forever to continue as a drain, it would have been absurd to announce that it was to be *changed into a canal of navigation.*

THE particular manner in which the Baron en-

FALL, 1811.
First District.

ORLEANS
NAVIGATION
COMPANY
vs.
MAYOR, &c. OF
NEW-ORLEANS.

larges upon the vast advantage which the commercial and agricultural interests of the province will derive from a canal connecting the navigation of the Mississippi and that of the lakes, evinces that this was his grand, his main object. It is true the Baron presents also as an inducement the draining of the waters of the city; an object which is announced to be temporary, but which must however be in a great degree permanently effected, as long as the canal remains, as it must insensibly drain the adjoining ground.

It is also clear that the canal was not intended, when arrived to its perfection, to continue to be the common sewer of the city. If it must receive all the filth of the streets, it will always be full of a quantity of putrescent matter, vegetable and animal, which in this hot climate must generate disease. Every stroke of the paddle or oar, every motion of the pole must stir up this body of putrid water and impregnate the air with pestiferous miasmata. Can it be supposed that the banks of such a sewer would be selected for shady walks, affording the inhabitants of the city a delightful promenade ?

III. A servitude in ordinary cases may be acquired by prescription. In the present, however, the defendants cannot pretend to any right on that score, for there cannot be any prescription against the sovereign.

*Moreau,* for the defendants. The plaintiffs

ORLEANS
NAVIGATION
COMPANY
*vs.*
MAYOR, &c. OF
NEW-ORLEANS.

cannot claim any right to the premises, under the act of the Territorial Legislature. They could not interfere in the disposal of public lands. The plaintiffs' charter cannot in this respect derive any validity from the silence of Congress. Until that body act upon the laws of the territory, their right of repeal continues. The Governor was directed to send the laws to the President to be laid before Congress, who had the power of disapproving them. 7, *Laws U. S.* 114. It would be going very far, to say that they derived any sanction from the circumstance of there being no evidence of their having been acted upon.

Neither, have the defendants precluded themselves from contesting the plaintiffs' pretensions, by taking a certain part of the stock, which the legislature had reserved for them. They having acquired an interest, in the plaintiffs' affairs, is no reason why they should not be allowed to contest any claim which the plaintiffs may set up against them. The mortgagee of an estate, the fee of which is held in common by several persons, may purchase or otherwise acquire the share of one of the mortgagors, without affecting his rights against the others.

THE plaintiffs' counsel having admitted that the owner of the superior estate may claim by nature a right of servitude over the inferior, in order to carry away the water which falls on the superior estate, it will be useless to produce any

authority in support of this proposition. It is not denied that the city stands higher than the ground on which the canal is dug. It follows then as a necessary consequence that the water of the city must have its way naturally over the ground behind it.

FALL, 1811.
First District.

ORLEANS
NAVIGATION
COMPANY
*vs.*
MAYOR, &c. OF
NEW-ORLEANS.

But the defendants chiefly rely as to the right which they claim of conveying the waters of the city, thro' the canal Carondelet into one of the branches of the Bayou St.-John, on an agreement or convention between the sovereign on the country at the time the canal was dug, thro' his representative the Baron de Carondelet, of the one part, and certain inhabitants of the city of New-Orleans and its environs, on the other.

It is contended on the part of the defendants, that, by this contract, the king, who was the owner of the inferior estate, consented to alter the natural course of the waters of the city, and to a new direction being given them, and that this contract has produced an obligation on the part of the owner of the inferior estate, to receive the water of the superior, not in the natural way, that is to say throughout every part of the land, but thro' a canal dug for a particular purpose at the expence of both the contracting parties. In other words, that the owner of the superior estate has thereby acquired a right of servitude in a particular spot.

It cannot be denied that the first object, *in point of time,* was the conveyance of the waters

FALL, 1811.
First District.

ORLEANS
NAVIGATION
COMPANY

vs.

MAYOR, &c. OF
NEW-ORLEANS.

of the city through the canal into the bayou. The first paragraph, read out of the Moniteur, announces that such is the intended use of the canal. But the plaintiffs contend that the same papers contain certain evidence that the canal was to afford this advantage for a short time only. It was to be *changed*, that is to say, it was to cease to be what it was at first, and become exclusively a canal of navigation.

ON the part of the defendants, however it is contended that taking all the communications of the Baron together, it clearly appears that his intention was that the canal should never cease to drain the city, not only by carrying off a part of the waters of it by filtration, after they were spread upon the commons, but directly by receiving the whole immediately; that the draining of the city, its health, the freeing it from the myriads of musquetoes which desolated it, was the first object in point of time and importance : one which was looked upon as secondary to no other, not even that of the extension of agriculture and commerce.

THIS intention having been communicated and aid having been solicited and obtained to carry it into effect, the advantages thus held out must be considered by the court, as the retribution which those, who accepted the offer, and on the faith of it sent their negroes, afforded their personal labour, or paid their money, have a complete right to require.

During the existence of the Spanish govern_ment, in this country, it appears the right of the defendants was never questioned. When the Baron is informed that the draining of the city will fill up the canal, he answers, it was dug for this object and means must be taken to make it answer it.

FALL, 1811.
First District.

ORLEANS
NAVIGATION
COMPANY
vs.
MAYOR. &c. of
NEW-ORLEANS.

In 1801, seven years after the canal was completed as a canal of navigation for schooners, the Sovereign himself declares by his schedule, that the water of the commons must not be suffered to lie on them, until the earth absordes them, or a part of them find their way into the canal by filtration : but trenches must be dug, in order that the waters may flow directly into the canal.

The right of drain thus recognized by the Baron de Carondelet and the King himself, after the period was passed, when according to the plaintiffs' construction of the words of the Baron, in the paragraph first read, the canal was to *change* its nature, cease to be used as a drain and be exclusively appropriated to navigation, are confirmed to the city by its charter ; and it cannot be believed that the legislative council, in granting certain priviledges to the plaintiffs, meant to destroy any of those of the defendants. The legislative council has not said so by express words —it could not have said it. If the plaintiffs, in the exercise of the rights vested in them, must affect those of other persons, their act of incorporation directs compensation to be made.

24

FALL, 1811.
First District.

ORLEANS
NAVIGATION
COMPANY
vs.
MAYOR, &c. OF
NEW-ORLEANS.

If in improving the navigation of a creek or bayou it becomes necessary to dig a canal they may do so, compensating those who thereby lose their land—If in order to improve the navigation of a canal, it becomes necessary that an individual or a corporation, who has the right of using it as a drain, should cease to exercise that right, the plaintiffs may insist on it, but they are bound to afford to the party at their own expence a drain equally convenient.

CONGRESS, in yielding their aid and countenance to the plaintiffs, could not sacrifice the rights of the defendants : it is not to be inferred from the circumstance of their having acted with liberality to the former, they have intended to act with injustice to the latter.

CUR. ADV. VULT.

LEWIS J. read the following opinion subscribed by MATHEWS J. and himself.*

THIS action is brought by the plaintiffs to ascertain and secure the right to the canal Carondelet, as a canal of navigation to the exclusion of the city of New Orleans, using it as a drain and place of deposit for the water and filth running from the town.

IT is unnecessary to investigate minutely the title of the plaintiffs, as it is admitted by the coun-

---

* MARTIN, J. was occasionally absent.

FALL, 1811.
First District.

ORLEANS
NAVIGATION
COMPANY
*vs*
MAYOR, &c. OF
NEW-ORLEANS.

sel of the defendants, that they have a right to improve the property, the subject of this contest, for the purpose of navigation, but burthened with their right of service to drain the city. This service, if it has an existence, must be considered in its nature a predial one—By the Civil Law, predial services are defined to be charges laid on an estate to the use of another estate, belonging to another proprietor. They originate either in the natural situation of the place, in the obligation imposed by law, or in agreement between several proprietors; the service claimed by the defendants must have its origin in the first or the last of these ways.

IT cannot be considered as one originating in the natural situation of the place; because it has been erected by the industry of man. It is not a right of service vested by grant or convention; for, in all grants, deeds, conventions or agreements, there must be two parties, the grantor and grantee, the contractor and the person contracted with, the party giving rights and the one receiving them. A property such as the defendants insist on in this case, belongs to that class called in the Common Law, *Incorporeal Hereditaments,* which are said to lie only in grant. No grant has been produced, giving the right of service contended for by them, nor has time sufficient elapsed to presume one and give a prescriptive title; no convention or agreement has taken place by which this right has become vested in the city,

D

FALL, 1811.
First District.

ORLEANS
NAVIGATION
COMPANY
*vs.*
MAYOR, &c. OF
NEW-ORLEANS.

for, being a body corporate, it could only conve-nant or agree by its head or representatives, the Cabildo.

THE use which the city has had of the canal in dispute, seems to have been nothing more than a permissive right allowed by the sovereign of the country, on account of that portion of labour furnished by the inhabitants of the city and country more immediately interested in its health and prosperity. From the evidence before us, we believe that the canal was originally made, for the two-fold purpose of draining the city, the low land in the rear of it, and that of navigation : the draining of the city is incompatible with its use for the latter purpose ; from the nature of things, it must and will drain the low lands in the rear of the city, and the wider and deeper it shall be made by the navigation company, the more effectually will it answer that end. It has been used by the city as a common sewer, until it has become unfit for any other service, and as the defendants have no absolute legal right to a sewer in it of that kind, their pretensions are unfound-in law : nor do we believe then better founded in equity and good conscience, in claiming compensation for the portion of labour they gave in the original formation of the canal, having so long used it to the total destruction of the most important purpose for which it was made ; but as some inconvenience may arise to the city if immediately enjoined from emptying its waters and filth into the canal as heretofore it has done.

FALL, 1811.
First District.

ORLEANS
NAVIGATION
COMPANY
*vs.*
MAYOR, &c OF
NEW-ORLEANS.

IT is therefore ordered, adjudged and decreed, and we order, adjudge and decree, that the defendants be and are hereby permitted to use the Canal Carondelet, as heretofore they have done during one month from this date, and that from and after the expiration of said month they shall be and are by this judgment for ever enjoined and prohibited from interposing or in any manner interrupting the plaintiffs in any work or improvement they may chuse to make on said Canal to facilitate its navigation, and that from and after the expiration of said period it shall no longer be a common sewer for the city of New-Orleans.

*Moreau*, for the defendants, moved for a new trial on the following grounds: because the judgment is contrary to evidence, and contrary to law.

1. Inasmuch as it declares the servitude, which the defendants claim, not established by nature.

2. Inasmuch as it declares the defendants, without a title, on the ground that there is no grant nor any agreement, or convention to which the cabildo, the legal representative of the city, was a party.

3. Inasmuch as it deprives the inhabitants of the city, and its environs, of the use of the canal as a drain, which they acquired for a valuable consideration, having furnished the greatest portion of the labour, employed in digging it.

FALL, 1811.
First District.

ORLEANS
NAVIGATION
COMPANY
vs.
MAYOR, &c. OF
NEW-ORLEANS.

4. Inasmuch as it impairs the right of the defendants, accruing under an implied contract between the sovereign and the inhabitants of the city and its environs.

I. It will be shewn from authorities derived from the Roman law, that when it is said, that the right of draining an estate is confined to the waters running down, without any alteration produced by the hand of man, such works only are intended as are erected by the owner of the superior estate, which tend to aggravate the condition of the inferior, as by encreasing the rapidity of the water; not such works as are made, in order to convey the water to a particular spot, as a canal. Since an express law of the *Digest*. *l*. 8. *lib*. 43. *t*. 20. grants to the owner of the superior estate, the right of conducting his drain through such part of the inferior as he may chuse.

II. It will be shewn by Spanish laws, and by evidence of the usages which prevail in Spain, that the king often grants, by edicts, declarations, and even by royal letters, privileges and immunities, and transfers property to corporations, and individuals, even to provinces, and even the public in general; and that although such favour may not have been solicited, such edicts, declarations or letters, are not less valid, are considered as obligatory on the crown, and are allowed in courts, to have the same effect, as contracts between individuals. Hence it

follows that the publication of the Baron de Carondelet, made with a view, to induce the inhabitants, to yield the labour of their negroes, formed a valid contract between the sovereign and those who in pursuance of these publications sent their negroes to dig the canal.

FALL, 1811.
First District.

ORLEANS
NAVIGATION
COMPANY
vs.
MAYOR, &c. OF
NEW-ORLEANS.

III. The defendants expect to shew, that it is contrary to law, equity, and the ordinance of 1787 art. 2, to deprive the inhabitants of the just retribution promised them, the *quid pro quo* for the labour of their slaves. The judgment is grounded on the proposition, that the canal has been used as a drain till now, but it is difficult to guess, by what rule the court ascertained that this temporay use was a *sufficient* compensation, while a perpetual one was stipulated.

IV. The judgment admits the canal was dug for the double purpose of a drain and navigation ; that such was therefore the intention of the parties. It is difficult to understand on what ground the court can after this admission interpose its authority and destroy the rights of the parties on the ground that the two purposes are incompatible.

*Livingston*, for the plaintiffs, moved that the reasons be overruled, under the 23d article of the rules of this court, *ante p.* 7, as not plausible nor susceptible of an useful or reasonable discussion.

LEWIS *J* They ought to be so. The case has been twice and very fully argued.

FALL, 1811.
First District.

ORLEANS
NAVIGATION
COMPANY
*vs.*
MAYOR, &c. OF
NEW-ORLEANS

MARTIN, *J.*    It is not in my power to concur. The opinion, which has now become that of the court, was shewn to me after the departure of Judge Mathews, and I then declared my inability to join in it.

As the defendants' counsel are dissatisfied, and have filed reasons for a new trial, it will naturally follow that one of the members of the court, who deemed it his duty to dissent from the opinion of the majority, will readily incline to a rehearing and will reluctantly forego the opportunity of listening to an argument which may elucidate the points upon which the judges hold different opinions. I am, therefore, averse to overrule the motion. It does not clearly appear to me, the language of our rules, that the grounds on which the defendants have built their hope of a new trial are not " plausible or at least susceptible " of an useful and reasonable discussion."

As the parties have treated the case as one of considerable importance, and as, it having been my misfortune when it was first argued, to differ from the opinion of one of my brothers and now with that of the other, it is likely that I labour under an error, I deem it proper to state the grounds on which, after the most mature deliberation and attention which I am able to give the subject, I have concluded that the defendants ought not to be prevented to use the canal Carondelet as a drain for the waters of the city, until the plaintiffs shall have given them a drain equally convenient.

FALL, 1811.
First District.

ORLEANS
NAVIGATION
COMPANY
*vs.*
MAYOR, &c. OF
NEW-ORLEANS.

To two propositions in the judgment of the court I am unable to give my assent. The first is that the claim of the defendants ought to be rejected, as it " belongs to that class called in " the common law *incorporeal hereditaments,* " which are said to lie in grant" and " no grant " has been produced giving the right of service " contended for." The other is that the claim is likewise to be disallowed, as " on *convention* or " *agreement* has taken place, by which a right " has been vested in the city, because being a bo- " dy corporate it could only covenant or agree by " its heads or representatives, the Cabildo," which does not appear to have been done.

As the claim of the defendants ripened into a title long before the inhabitants of Louisiana, had any connexion with a people who recognize the common law of Great Britain as a rule of conduct, I am at a loss to discover how the discussion of that claim may be aided by ascertaining its character, under the principles of the common law, and how we can declare it void, on account of the absence of a formality required only by the common law.

WE should rather ascertain its character by the principles of the civil law, which was the *lex loci* and enquire only whether it was created or modified into its present shape, in the manner which that law prescribes.

I. THE defendants claim the right of emptying the waters of the city into the canal Carondelet,

FALL, 1811.
First District.

ORLEANS
NAVIGATION
COMPANY
*vs.*
MAYOR, &c. OF
NEW-ORLEANS.

and conveying them through it to the Bayou St. John : *Jus cloacæ mittendæ.*

THIS right is a SERVITUDE. *Jus cloacæ mittendæ servitus est. Dig. lib.* 8. *tit.* 1. *b.* 7.

SERVITUDES are established by conventions or stipulations, or by will. *Si quis velit vicino aliquod jus constituere pactionibus atque stipulationibus id efficere debet. Potest etiam testamento quis hæredem suum damnare . . . . . ut patiatur eum (vicinum) per fundum ire, agere aquamve ex eo ducere. Inst. lib.* 2. *tit.* 3. *s.* 4.

PERMISSION and forbearance establish servitudes. *Traditio plane et patientia servitutum inducit officium prætoris. Dig. lib.* 8. *tit.* 3. *b.* 1. § 2. The commentator understands that permission alone establishes a servitude, in the same manner as forbearance *(note* 18.*) Aut ita legendum, aut hic sensus est ! Patientia plane, ut traditione servitutem inducet officium prætoris.*

II. A right may vest in a person, natural or corporate, without any covenant or agreement of such a person. In the present case a convention or agreement between the government or the Baron de Carondelet and certain inhabitants of the city and its neighbourhood may have vested the right of drain in the city.

WHAT concerns the interest of a third person may be the object of a contract, *in conditione aut in modo. In modo, i. e.* that although I cannot directly stipulate what concerns the interest of

a third person, yet I may alien what belongs to
me, with a stipulation that the person to whom I
alien it, shall do a thing which concerns the interest
of a third person. 1 *Pothier on Obligations*, 64,
*n.* 71. Thus the individuals, who paid money or
furnished the labour of their slaves, might fairly
stipulate with the Baron, that the city should have
the use of the canal for a drain.

FALL, 1811.
First District.

ORLEANS
NAVIGATION
COMPANY
*vs.*
MAYOR, &c. OF
NEW-ORLEANS.

ACCORDING to the principles of the old Roman
law, a third person, who had not been a party to
the contract derived no right of action therefrom.
But according to the constitutions of the Empe-
rors, a third person, in whose favour a donor adds a
charge to the gift, has an action to compel the donee
to fulfill the intention of the donor. *Cod. lib.* 8,
*tit.* 55, *l.* 3, *note* 18, *speciale est in donationibus,
contractibus, ut alteri per alterum quæratur ac-
tio.* The action of the third party was called
*actio utilis,* the name Roman lawyers gave to ac-
tions, which had no other foundation than equity.
*Quæ contra subtilitatem juris, utilitate exigente
ex solâ æquitate concedebantur,* 2 *Pothier on Ob-
ligations,* 50 *no.* 72.

THUS could a right be vested in the corpora-
tion of the city, without any covenant or agree-
ment made by its head or representative, the Ca-
bildo.

NEITHER is it clear that a person, who was not
one of the parties to a contract, cannot, in countries
where the common law prevails, acquire a right
of action under it. In many cases the courts of
Great-Britain have allowed such a right.

E

FALL, 1811.
First District.

ORLEANS
NAVIGATION
COMPANY
vs.
MAYOR, &c. OF
NEW-ORLEANS.

A promise was made to the after husband's father to pay him *L.* 10 and the husband brought the action—held to lie : for *the party to whom the benefit accrues may bring the action.* *Provender* vs. *Wood.* *Hett.* 30.

WHERE a man promised to another to make satisfaction for all the debts which he owed to another, who was absent, the *creditor* brought an action and held to lie. *Het.* 177, *cites* 43 *and* 44, *Eliz. Rixon* vs. *Horton.*

A. promised B. that in consideration B. will make unto A. a lease of certain lands, A. will assign them to B's servant—the *servant shall have the action* and not B. *Arg.* 2 *Le.* 205, *pl.* 225, *cites it as* 25 *El. Crew's case.*

AN action may be maintained by a daughter *on a promise to her father* for her benefit, on a consideration moving from the father. *Dutton* vs. *Poole.* 1 *Ventris* 318, 332 ; *T. Jones* 103. In *Martin* vs. *Hind, Douglas,* 146, lord Mansfield said it was difficult to conceive how a doubt could be entertained on this point.

IN *Marchington* vs. *Kernon,* 1 *Bos. & Pull.* 101, *Buller J.* said that if a person make a promise to another for the benefit of a third, *the latter may maintain an action upon it.*

CANDOR induces me to acknowledge that the authorities on the other side of the question are the most numerous and perhaps the most conclusive. *See* 1 *Viner* 333—37, 2 *Evans' Pothier* 32 ; 3 *Bos. & Pul.* 149, *n.* 1, *Ventris* 6. 1. *Str* 592.

FALL, 1811.
First District.

ORLEANS
NAVIGATION
COMPANY
*vs.*
MAYOR, &c. OF
NEW-ORLEANS.

In my view of the case, the defendants had by nature the right of emptying part of the waters of the city, on the spot on which the canal has been dug, and they have acquired that of of conveying the whole thro' the canal by a convention or agreement.

It is in evidence that all the lands immediately behind the city lie lower and naturally receive the waters of it—that behind Fort Ferdinand, which stands close to the former ramparts and opposite to the middle of the city, the land is higher than on each side and gradually slopes towards the middle of the square between St. Philip and Maine streets, on one side, and towards the very spot on which the canal is dug, on the other; that spot being lower than both the sides of it. So that naturally part of the waters of the city flowed on it; and although the lateral slope has very little steepness, yet, in high water, the thread of the stream was plainly perceivable in the present line of the canal.

The city has therefore a right of draining its water as a natural servitude on the land behind it. *si tamen lex non sit agro dicta, agri naturam esse servandam & semper inferiorem, superiori servire, Dig.* 31, *lib.* 39, *tit,* 3, *s.* 23, and this right exists on every part of the land behind the city. *Quæcunque servitus fundo debitur, omnibus ejus partibus debitur, Dig. lib.* 8, *tit.* 3, *l.* 21, *s.* 3. The right is on the whole and each part. *Jus servitutis totum est in toto et qualibet ejus*

FALL, 1811.
First District.

ORLEANS
NAVIGATION
COMPANY
*vs.*
MAYOR, &c. OF
NEW-ORLEANS

*parte, civiliter tantum. Bart. vid. l.* 1, *s.* 16 *de aqua quotia.*

So that the owner of the inferior land cannot free any part of it from the servitude. In deepening this lower spot into a canal, the right of the owner of the superior land, to convey the water which before flowed on it, could not be affected, without affording him elsewhere a conveyance equally convenient.

THIS natural right of servitude was in the year 1794 modified by a convention or agreement.

THE parties have laid before us several papers which are admitted to be official.

THE first announces the intended digging of the canal Carondelet : It is spoken of as a canal which *(emptying the waters of the city and* " *its environs,* into one of the branches of the " bayou) will rid it of the stagnating waters " which contribute peculiarly to its insalubrity " and the myriads of musquittoes which render " it so unpleasant an abode, during summer."

IT states that " the expences of the war preclud- " ing the hope that the royal treasury would con- " tribute to the expence of a *considerable canal* " *of navigation,* government had only solicited " the king to allow the convicts (which were a- " bout to be transported to Pensacola) to remain " in New-Orleans, engaging with their aid and " that of several inhabitants, zealous for the pub- " lic good, to dig a *canal d'egoutement,* (a canal

FALL, 1811.
First District.

ORLEANS
NAVIGATION
COMPANY
vs.
MAYOR, &c. OF
NEW-ORLEANS.

" for draining,) which *will be changed* in succes-
" sive years into a canal of navigation for schoon-
" ers."

ANOTHER paper announces the completion of
the *canal of the city* as far as the bayou, with a
width of fifteen feet, and the intention of the go-
vernor to have it dug one foot deeper, from the
high land of the Lepers to the city, so as to en-
able the schooners to reach its gates. It con-
cludes " The work could be completed in eight
" days, if the planters and inhabitants of the city
" would aid it with one negro each, during three
" days—an object of little moment which never-
" theless will *rid them* TOTALLY *(les délivrera*
" *totalement )* of the stagnating waters and con-
" sequently of the sickness so common in the
" fall."

IT is in evidence that the inhabitants and neigh-
bouring planters very cheerfully complied with
the Baron's requisition—those among the former
who had no slaves, working personally on the
canal, or furnishing an equivalent in money. In-
deed a gentleman who surveyed the works under
the Baron's order, has deposed that in his belief
the convicts did not effect one third of the work.

WE are further apprised that the Baron's in-
tention was to extend the canal to a width of
thirty feet in course of time, and that he caused
*gargouilles,* (large wooden gutters,) to be placed, at
a reasonable distance from each other, on each
side of the canal, the issues of which were stop-

FALL, 1811.
First District.

ORLEANS
NAVIGATION
COMPANY
*vs.*
MAYOR, &c. OF
NEW-ORLEANS.

ped in time of rain, the water suffered to settle and deposit the earth it brought down, and when perfectly clear allowed to find its way thro' the canal to the bayou. A keeper was appointed for this service.

LASTLY, a royal schedule of the 10th of May, 1801, six years after the completion of the canal, directs the commons of the city to be drained by trenches into the canal, so as to put an end to the putrid fevers occasioned by stagnating waters, and yet attended with great mortality.

FROM all this testimony the impression which my mind receives is that the defendants have satisfactorily proved the right of the city to a drain through the canal—a right which naturally existed over this particular spot, in a more eminent degree than over any other part of the commons, except on another between Maine and St. Phillip streets, and has been altered into its present form by a convention or *agreement*, between the King or the Baron of Carondelet, as his representative, and a number of inhabitants of the city and planters of the neighbourhood.

AN agreement or a pact is the assent of two or more persons on the same object. *Duorum vel plurium in idem placitum consensus. Dig. de Pactis l. 1. s. 1. Domat p. 1. b. 1. t. 1.*

Now, in the present case, the proposition of the Baron, that the persons to whom it was made should afford the aid he wanted for digging a canal, *emptying the waters of the city and its*

*commons into one of the branches of the bayou* was accepted, the aid furnished, and the Baron undertook to apply it to the object for which it was yielded. Here is then a complete pact or agreement. It has been faithfully carried into effect : the parties to it must reap the promised advantage—their right thereto is perfect.

THE inhabitants of the city and planters, who furnished the consideration, have the right of claiming it back, if the promised advantages are withheld. The civil law gives them an action called *condictio ob causam dati, causâ non secutâ.* If the advantages were intended for a third person, natural or corporate, who was not a party to the agreement, there results for him the *actio utilis, quæ contra subtilitatem juris, utilitate ita exigente, ex sola æquitate concedebatur.* 1 Pothier on Obligations, 50, n. 72.

THE plaintiffs' counsel has however contended that the canal was intended for two objects, which cannot exist together, navigation and a drain—that the first was the main one, the other merely incidental, during a short period, and necessarily intended to give way to the principal one.

THE evidence of this fact is sought in the first paragraph of the Moniteur, read in evidence. The canal is there called *a canal of drain which will be changed in successive years into a canal of navigation for schooners.*

THE word *changed* is represented as a sacra-

FALL, 1811.
First District.

ORLEANS
NAVIGATION
COMPANY
vs.
MAYOR, &c. of
NEW-ORLEANS.

FALL, 1811.
First District.

ORLEANS
NAVIGATION
COMPANY
*vs.*
MAYOR, &c. OF
NEW-ORLEANS.

mental word, which must be construed strictly —and thus necessarily precludes the idea of the canal remaining *after* the change, what it was *before.*

WORDS are not always to be understood in their strict grammatical sense—the intention of the party who utters them is to be considered. Now in the case before us, the canal is presented to our view in its original plan, and in two improved ones. It is mentioned as a canal for a drain, a canal of navigation for schooners, with a width of fifteen feet, lastly, as a *considerable canal of navigation* of double that width, as one witness, *Castanedo,* has sworn, and as the paragraph in the Moniteur describes as one, *the expenses of the war precluding the hope that the royal treasury would contribute to.*

Now that the objects of a drain and of a canal of navigation for schooners could be simultaneous, in the contemplation of the Baron, clearly appears. For when he announces, in the third paragraph, that with the help of a certain number of negroes during three days, the work will be completed as a canal of navigation for schooners, these vessels being enabled to come up to the very gate of the city, he assures the persons from whom he solicits this last aid, that by yielding it, they will be *totally* rid of the insalubrity of the city : an advantage which is presented as a prominent object, and that of the approach of the schooners as far as the gates as the secondary one.

A mode of expression which repels the idea, that the two objects were not to be simultaneous —or that the canal, being navigable for schooners, had undergone such a *change*, as to render it necessary that the people should be at the trouble and expense of a new canal, to serve as a drain to the waters of the city—while they were promised that they would be *totally* rid of them.

FALL, 1811.
First District.

ORLEANS
NAVIGATION
COMPANY
*vs.*
MAYOR, &c. OF
NEW-ORLEANS.

THE intention of the Baron, if it was not sufficiently expressed by his words, is manifested by the fixing of the *gargouilles*, or wooden trenches, through which the stagnating waters, on the back of the city, were to be conveyed to the canal, and the establishment of a keeper to attend to them, after the canal had become fit for the navigation of schooners: and six years after the plan of the Baron, in this respect, incidentally received the sanction of the king, by the schedule of 1801.

THE canal was to undergo its change from a *drain* to a *canal of navigation for schooners* and afterwards *a considerable canal of navigation*, of the width of thirty feet, and still continue to answer its primitive and posterior destination and serve as a drain and a canal of navigation for schooners, in the same manner as an individual passes through the stages of childhood, adolescence and virility, without ceasing to be the same person.

THE change was to be effected *in successive years*. If it was to have taken place, by the canal ceasing to be used as a drain, successive years

F

FALL, 1811.
First District.

ORLEANS
NAVIGATION
COMPANY
*vs.*
MAYOR, &c. OF
NEW-ORLEANS.

would not have been required for this purpose. It would only have taken one day to throw a dam across the spot on which the waters of the city entered the canal. If, on the contrary, the change was to happen by gradual deepening and widening, then the words *successive years* are properly used. They are senseless, if the change is to be a sudden one, as the plaintiffs' counsel imagines.

BUT, the last paragraph, *ante* 11—12, puts the matter beyond the possibility of a doubt.— Read it, in connection with the other two, and it clearly repels the idea, that the word *changed* in the first, is to be taken in any other sense, than as synonimous with the word *improved*. Read it without a connection with the others, it creates a new contract. If the planters and citizens, says the Baron, will send one negro each for three days, they will be rid TOTALLY of the *stagnating waters and consequently of the sickness common in the fall.* Can the court understand that his meaning was, that in order to get rid of these stagnating waters, the people would be called upon to dig another canal? He assures them they will get *rid of them* TOTALLY.

THE counsel for the plaintiffs have finally pressed upon the court, as conclusive evidence, that the Baron never intended, that the waters of the city should pass through the canal, the two walks bordered with trees, which are mentioned as affording a delightful promenade. These walks do

not appear to have been intended to be made, till the canal had reached its utmost width, the double of the present. At the cession of this country, eight years after the completion of the work in its second stage, as a canal of navigation for schooners, the walks were not begun—and they could not be—since the intended margins of the canal were not yet fixed upon. When the canal had obtained a width of 30 feet, with a proportionate depth, the mass of water would be too considerable, to be affected with the portion of the filth of the city, which might reach it.

ADMITTING that the agreement or convention was not evidenced, by any words or communications, it would be the duty of the court to imply it, from what has been done. If a canal be made to convey the waters of two estates, by the proprietors, or a person have the right of conveying the water of his field through the neighbouring one, when once a canal is dug for this purpose, it cannot afterwards be altered. This is the opinion of Sabinus. *Sabino quoque videbatur qui argumento rivi utebatur : quem primo qualibet ducere liquisset, posteaquam ductus esse, transferre non liceret. Dig. l. 8. tit. 1. b.* 9. The canal having been dug by mutual consent, no one has a right to change its direction.

I CONCLUDE that the Baron does not appear, in any of his communications or proceedings, to have ever expressed or entertained the idea that there would be occasion of digging any other ca-

FALL, 1811.
First District.

ORLEANS
NAVIGATION
COMPANY
*vs.*
MAYOR, &C. OF
NEW-ORLEANS.

ORLEANS
NAVIGATION
COMPANY
*vs.*
MAYOR, &c. OF
NEW-ORLEANS.

nal: on the contrary, he clearly expressed and manifested a contrary idea.

BUT the counsel for the plaintiffs say, that, whatever may have been the intention of the parties, as the canal was avowedly dug for two purposes —the draining of the city and navigation, it now clearly appears both purposes cannot be answered and therefore the less important must be abandoned.

THE fact is far from being established. An engineer *(Tanesse)* has deposed that were the canal carried to its intended width, a drag, or *marie salope*, might clear it of the earth, the waters of the city would carry with them.

BUT admitting the fact. Congress or the Legislature, in sanctioning the improvement of the canal by the plaintiffs, do not appear to have intended, if they possessed the power, to have destroyed the right of the defendants. If the exercise of this right be incompatible with the intended improvement, the civil code has provided the means, by which the interests of both parties may be reconciled.

IT authorises the plaintiffs to free themselves from the inconvenience of receiving the waters of the city, thro' the canal, by affording to the defendants a drain, equally convenient elsewhere. " Yet, if this primitive assignation has become " more burthensome to the proprietor of the estate, which owes the service, or if he is thereby prevented from making on his estate some " advantageous repairs, he may offer to the pro-

" prietor of the other estate, a place equally con-
" convenient for the exercise of his right, and
" the owner of the estate, to which the service is
" due, cannot refuse it." *Civil Code* 140,
*art.* 64.

FALL, 1811.
First District.

ORLEANS
NAVIGATION
COMPANY
*vs.*
MAYOR, &c. OF
NEW-ORLEANS.

IN cases of doubt the court will ever lean in favor of the party, *qui certat de damno vitando.* The other, *qui certat de lucro captando*, is not to be favored.

THE plaintiffs in this case are mere donees or volunteers—They have paid no consideration. The defendants, on the contrary, if the judgment of the court be against them, lose the whole labour and expence of digging the canal. I say *the whole*, because three fourths of the canal were dug by the personal labour of some of the inhabitants of the city and neighbouring planters, the labour of their negroes, and with the money of others—and the other fourth by the labour of the convicts which the Sovereign bestowed as a favour (*grace.*) So says the Baron. Now the right of the city, in this last fourth, is as strong as in the other three. Surely, the sovereign, having bestowed this gift, favour or grace, could not fairly recall it. Altho' the city did not make any advances, from the corporate chest, yet her rights are the same: for the canal was dug to avoid an expence, the city would have been compelled to undergo, if her administrators respected the health and lives of her inhabitants. The very persons, who furnished the aid directly,

would have been necessarily called upon to enable the corporate chest to perform the work. If a drain is now to be dug by the city, such of those persons who are still living, and the descendants of the others, must put their hands into their pockets, to do that once more which has already been done at their cost.

THE act of 1811, *c.* 6, directing a new trial in all cases in which the court are divided : the motion was set down for argument, at the next term.