*THE ORLEANS NAVIGATION COMPANY*
vs.
*THE MAYOR &c. OF NEW-ORLEANS.*

Spring 1811.
First District.

Whether the city of New-Orleans may drain its waters in the canal Carondelet?

THIS was an action brought to try the right of the corporation of the city of New-Orleans, to drain the waters of the city into the bayou St. John, through the canal Carondelet.

THE city is built on the Mississippi, the banks of which gradually slope from the river, so that the rain water runs from them into a cypress swamp, which lies behind the city, parallel to the river, and through which runs a creek called the bayou St. John.

IN the year 1794, a canal was dug from the city, through the swamp, to the bayou St. John, which the corporation of the city contended irrevocably altered the natural course of the waters from the city and its environs.

THE navigation company considered the canal as one of the navigable waters, which their charter authorises them to occupy and improve: under the idea that whatever might have been the original destination of the canal, its last and permanent one was to be exclusively applied to the purpose of navigation. They erected a dam to give a new direction to the water, so as to prevent its falling into the canal.

THIS dam having been destroyed by order of the city council, the present suit was brought.

BY consent, a paragraph from the *Moniteur de la Louisiane,* of the 26th of May 1794, was

Spring 1811.
First District.

Orleans
Navigation
Company.
vs.
Mayor &c. of
N. Orleans.

read, announcing the intention of government to dig a canal, which, carrying the waters of the city and its environs, in one of the branches of the bayou, would rid it of the stagnating ponds which contributed to its sickness, and the vast quantities of musquitoes, that rendered it unpleasant in summer.

The paper further states that the expenses of the war allowing no hope, to obtain any aid from the royal treasury, for the digging of a considerable canal of navigation, government had asked nothing from his majesty, but the stay of the chain-negroes, by whose labour and that of such hands as might be supplied by zealous individuals, a canal *d'égoutement*, for carrying off the water, might be dug, which in successive years might be changed into a canal of navigation for schooners—that the king had assented to the proposition. The intention of the government is next announced, to request from the inhabitants of the city, in the month of June following, such number of negroes, as they might supply, to clear the ground thro' which the canal was to pass : promising that, this being done, the chain-negroes would dig the canal.

An eight foot passage, it is said, will be left on each side of the canal, for the horses drawing the flat-boats, and in time the schooners ; and a wide levee is to be destined to foot travellers, and, under a double row of trees, afford an agreeable walk.

ANOTHER paragraph of the same paper, dated the 19th of November 1795, announces that six days of the labour of the negroes in the city, and within fifteen miles around it, will enable government to complete the canal, so far that the schooners might come up to the city : and the people are solicited to send their slaves.

SPRING 1811.
First District.

ORLEANS
NAVIGATION
COMPANY
*vs.*
MAYOR &c. OF
N. ORLEANS.

A circular of the 15th of September, noticing the advantages the city had derived from the canal, in procuring fire wood with greater ease, in the marked diminution of mortality during the preceding season, and the draining of the water from the back part of the city, presses the civil officers, to solicit from the inhabitants, additional aid of slaves, expatiates on the advantage the commerce of the city will derive from the canal and the satisfaction the people will have in beautiful shaded walks, on each side of the canal.

A paragraph in the *Moniteur* of the 23d of November, asks for eight days work of a slave from each of the inhabitants of the city and neighbourhood, promising that after this aid, the chain-negroes would be able to complete the canal.

A royal schedule was next introduced, dated May 10, 1801, by which the king yielded his assent to the governor's representation that the three hundred toises, *de las tierras comunes*, of the commons, out of the city, nearest to the

ORLEANS
NAVIGATION
COMPANY
*vs.*
MAYOR&c. OF
N. ORLEANS.

fortifications, which in their situation produced nothing, being covered by water more than six months in the year, might be divided into small lots of seventy toises in front and one hundred and fifty in depth, and let out for a moderate rent, to such inhabitants of the city, as might wish to occupy them as gardens, and the money thus raised applied to the lighting of the city : so that in the course of a few years, the whole ground might, by tillage, be raised above the level of the water : the occupiers of these lots draining them by trenches into the canal Carondelet, so as to put an end to the putrid fevers occasioned by the stagnation of waters in ponds near the city, which were attended with so much mortality.

THE engineer, who directed the digging of the canal, testified that before that time, the ordinary and natural disgorgement of the waters of the city, was on the place on which the canal was dug : tho' another respectable witness assured that it was at some distance, behind the hospital.

IT was in evidence that the inhabitants of the city and neighbourhood freely sent their slaves to work.

A resolve of the city council was offered, by which that body determined not to prevent the throwing up of the dam, raised by the navigation company. This resolve, however, had not the approbation of the Mayor ; nor did it appear to have been sent to that officer for it.

Livingston for the plaintiffs. The charter of the navigation company, 1805 *c.* 1. *sec.* 7, authorises the plaintiffs to " enter into and upon " all and singular the lands covered with water" for the purpose of improving the navigation of the territory : and the 12th section provides that " if any person shall break down or destroy " any embankment or other work, lawfully erect- " ed by virtue of this act.....besides making good " all the damage occasioned thereby...shall for- " feit and pay,...the sum of one hundred dollars."

SPRING 1811.
First District.

ORLEANS
NAVIGATION
COMPANY
*vs.*
MAYOR &c. OF
N. ORLEANS

IT is to be observed that this act ought to have the force of an act of congress, for it was passed by the legislative council of the territory, whose acts were liable to be repealed by congress : and congress, not having done so, have impliedly given it their sanction. Nay they have recognised it, having made it an express condition of a grant of land to the city, that a gratuitous conveyance should be made to the plaintiffs, of as much of the commons of the city, as shall be necessary to continue the canal Carondelet, from the present basin, to the Mississippi. 1807, *chap.* 27:

THE plaintiffs were then authorised by the legislature of the territory and that of the Union, to enter upon the land on which the trespass has been committed and prepare the water course for navigation. In the execution of this authority, they erected the dam, which the defendants

Mm

SPRING 1811.
First District.

ORLEANS
NAVIGATION
COMPANY
vs.
MAYOR &c. OF
N. ORLEANS.

have destroyed—a *work,* in the language of the plaintiffs' charter, *lawfully erected by virtue of this act.*

THE publications, in the *Moniteur,* clearly shew that the primary object of the canal was navigation, altho' at first and until this end could be attained, another was held out as an inducement to the people to send their negroes, the draining the stagnating water from the back of the city.

BOTH the objects could not be simultaneous for one would necessarilly prevent the other. The draining the waters and carrying off all the filth of the city into the canal, must, in a very short time, fill it up and render it absolutely unfit for navigation.

THE paragraphs in the *Moniteur,* which are believed to be official, convey ideas which re-repel the presumption that the canal was intended to be the receptacle of the filth of the city. They speak of *double rows of trees, affording an agreable walk,* of *the satisfaction the people will have in beautiful shaded walks on each side of the canal :* advantages inconsistent with the belief that the surface of the water, between these promenades, will be covered with dead animals and the sweepings of the yards and streets of the city.

THERE was then a time, when the destination of the canal was to be altered and instead of being a canal *d'égoutement,* it was to become a

canal of navigation.  The legislature have de-<br>
clared that that moment was arrived, when they<br>
vested in the plaintiffs, the right of improving<br>
this water-course, as well as all others suscepti-<br>
ble of that kind of improvement.

SPRING 1811,<br>
First District.<br>
ORLEANS<br>
NAVIGATION<br>
COMPANY<br>
vs.<br>
MAYOR &c. OF<br>
N. ORLEANS.

LASTLY : were we to admit the right of the city to the canal as a drain, the city council, by their resolve, have completely parted with it. It is true this resolve does not appear to have been sent to the Mayor for his consideration.  By the 11th section of the act of incorporation, all resolutions of the city council for the disposal of public pro-perty are to be " sent by the said council to the " Mayor, immediately after the same shall be " passed."  Of this sending, in the present case, the plaintiffs cannot have any evidence.  But the rule *omnia recte acta* is surely applicable to this case, and the council are not to complain, when we presume they have done their duty.

*Moreau* for the defendants. Every undertaking which alters the running of the public water, is for-bidden. *Arg. legis* 16 *ff. Loix Civiles, liv.* 2, *tit.* 8, *s.* 3, *n.* 11. *Franc. Marc. t.* 1, *q.* 589, 597. Infe-rior land must receive the water of superior. *Le-laure des Servitudes,* 19. Servitudes are acquired by grant or use. 3 *p. l.* 14, *t.* 31. *Ley* 15, *eod. tit.*

THE plaintiffs are incorporated " for the " purpose of improving the internal navigation " of this territory."  This, perhaps, authorises them to occupy and improve all natural water

SPRING 1811. courses susceptible of improvement, but cer-
First District. tainly, does not vest in them artificial canals,
ORLEANS  made at the expense of other persons, and for
NAVIGATION
COMPANY  particular purposes, as the canal Carondelet and
vs.     the canal Marigny.
MAYOR &c. OF
N. ORLEANS.  THE canal Carondelet was dug, at the ex-
pense of the inhabitants of New-Orleans, with
the aid of the chain negroes, *granted to them* by
the king, on the representation of the governor,
whose name it bears : and we are informed, from
high authority, that, if the expenses of the war
had not forbidden it, an aid would have been ob-
tained from the royal treasury.

THE papers read in evidence clearly establish
this proposition that the canal was built at the
expense of the inhabitants, who spared their ne-
groes, aided by the king's grant of the labour of
the chain negroes, at the instance and solicita-
tion of his representative in the province.

IT was dug for a particular purpose : that of
ridding the city " of the stagnating ponds which
" contributed to its sickness and the vast quanti-
" ties of musquitoes, that rendered it unpleas-
" ant in summer," and the idea is held out that,
in successive years, it might be changed into a
canal of navigation for schooners.

SURELY, the city, from the moment the canal
was dug, rightfully claimed the use of this canal,
which it had acquired partly for a *valuable* and
partly for a *good* consideration. A right which

if it wanted confirmation, and if that confirma-
tion could be given it by the legislature of the
territory, was confirmed by that body, in the ORLEANS
NAVIGATION
COMPANY
vs.
MAYOR &C. OF
N. ORLEANS.
charter of the defendants, which is anterior to that
of the plaintiffs.

ADMITTING for argument's sake, that the
charter of the plaintiffs vested any right to the
use of the canal, it did not authorise them to
alter the course of the water. It did not vest in
them the right of determining ( alone and with-
out the concurrence of the party, who had an in-
terest in resisting the change ) that the moment
had arrived when the canal was to become a
canal of navigation and a canal of navigation only.
The act of the legislature cannot be said to have
done so, by implication : for they do not appear
to have had this canal in contemplation, indeed
any artificial canal dug for a particular purpose,
*iniquum est perimi pacto, id quod cogitatum non
est.* And had they thought of it, they could not
have done it; for such canal has necessarily
an owner : and that owner was, either the city,
or the United States, who might claim it as suc-
cessors to the crown of Spain.

BUT, surely, even if the city have no right to
the canal, they certainly have that of preventing
a diversion from the actual course of the water.
The present direction is, either the natural one,
as one of the witnesses has sworn, or the one
which has been given to it, by the concurrent

Spring 1811.
First District

ORLEANS
NAVIGATION
COMPANY.
*vs.*
MAYOR &c. of
N. ORLEANS.

act of the king and the city, the only parties who had an interest therein.

LEWIS *J.* The city have no right in the canal. They never had any. The negroes who were sent to aid those of the king, (the chain-negroes,) were the property of individuals, who willingly yielded their labour, without stipulating for any advantage to themselves or to the city. It was a voluntary curtesy. Nay, if the advantages held out by the governor to induce the inhabitants to send their negroes, may be viewed as the consideration of their services, they have already had the full benefit of it. The canal was not to be used as a drain for ever. It was expressly mentioned to them, that in time it would be changed into a canal of navigation for schooners. This time has arrived, and as the use of the canal, as a drain, is incompatible with the use of it, as a canal of navigation, the city have no longer the right to empty the waters of their streets into it.

MARTIN *J.* I think differently. It is far from being clear to me, that the canal cannot be used both as a drain and a stream for navigation. Witnesses have informed us, that in the latter years of the Spanish government, large wooden gutters, *gargouilles*, had been placed on each side of the canal, the issues, of which were stopped in time of rain, and the water suffered to settle and deposit the earth, it brought down, and when perfectly clear, it was allowed to find its way thro' the canal. Thus the filling up of

the canal was prevented and dirt was procured to raise the ground near it. As late as the year 1801, the royal schedule mentions the king's intention that trenches might be dug to convey the water from the commons into the canal. Hence, I infer that the natural direction of the waters, of the city and the commons was, by the sovereign's authority, changed and established as it now is. No one has a right to alter it.

*Denisart, verbo* LABOUR, cites a case determined in one of the parliaments of France, *Laurent vs· Warin,* in which the court held that " when in a " piece of land, there is a water course which " carries off the rain water, it is not lawful for " the owner of the land to give it another direc- " tion over the land, if the alteration occasion " any detriment to the adjacent estates." Thus the law of France, the original law of this country, corresponds with that of Spain. If a new direction is now given to the waters of the city, the owners of estates below it, down to the bayou, will not be obliged to give it passage over their land, in which they may have made improvements incompatible with the passage of these waters. Having bought their estates free from such a burden, they will now resist the imposition of it.

NEITHER, can I refrain from considering the advantage, held out to the inhabitants, the clearing of stagnating ponds, which occasioned deadly fevers, and gave birth to myriads of musquit-

oes, which so desolated them, that their houses became inhabitable, as objects of major importance, and as the price promised them for the labour of their negroes. If the all-powerful hand of the sovereign might at all times, despoil them of these purchased advantages, of which there is no evidence, their right to them, like all other rights, has been strengthened and rendered less precarious by the change of government. Surely in the most despotic, they could not fairly have been deprived of it. *Turpis est fidem fallere.*

I cannot construe the plaintiffs' charter as affecting the defendants' rights. According to the counsel of the former, the city are to lose both the promised advantages—the use of the canal as a drain—the use of it as a stream of navigation. For it is to lose it as a stream of navigation, if they must pay for navigating it : the canal then will not be the property of the defendants, but of the plaintiffs.

THE city council have not parted with any of their rights by their resolve. It is not to be presumed that it was their intention to make a present to the plaintiffs. *Nemo presumitur donare.* The reason, that this resolve was not sent to the Mayor for his consideration appears to me to be, that it is not *for the disposal of any public property, or the payment of any monies.* Resolves, for these objects, being the only ones that require the Mayor's consideration.