On the Merits.
[2] Counsel for defendant say in their brief:
“The clear meaning of this act [referring to Act No. 74 of 1858] is, that the state gives the corporation a free and absolute grant of corporate life, without conditions or price, and reserves the right to take its property, at the end of 50 years, upon making due compensation, to be determined as provided.”
We do not, however, find the clear meaning thus referred to, and, if it were clear from the act of 1858 that the state has obligated itself to compensate the defendant for any of its property that may be taken, the act of 1857 is also to be reckoned with, and between the two the question remains, What does the property of the defendant, for which it is entitled to compensation, consist of; and does the obligation of the state to make compensation therefor preclude it from in the meanwhile recovering any property of its own that may be in defendant’s possession?
The act of 1858 purports to be a piece of independent legislation, telling its own story, without affecting, or being affected by, any pre-existing law; and section 4, on which defendant relies, and which we reproduce for convenience, reads;
“That the said company shall enjoy corporate succession during fifty years from this date; after which time it may revert to the state, upon due compensation being made, according to award by three commissioners, one, appointed by the Governor of the state, one by the company, and the third by any court of record of New Orleans.”
The only antecedent for the relative pronoun “it,” as used in the section quoted, is “the said company,” but, as it (the said company) cannot “revert” to the state in any practical way, we disregard all rules, except that which requires a court to endeavor to give effect to the real meaning of the lawmaker, and, seeking an antecedent elsewhere, naturally prosecute the search within the limits of the act of 1858, before going further. Section 3 provides that the city of New Orleans shall be prohibited, after five years, from draining into the Bayou St. John; that it shall indemnify the company, if it does so; and that it may build bridges over the bayou, within five squares of each other. There is nothing there that could “revert to the state.” Section 2 provides that:
“The company shall have the right to construct a railroad, with single or double track, on either side of their basin, canal and the Bayou St. John, from the head of said basin, on Toulouse street to the lake end, with the privilege of passing through such private property and lands as may be needed, upon due compensation made to the owners thereof, in conformity with existing laws; and they shall be authorized to transport, on said road, freight and passengers, for hire.”
And there is a further provision concerning the use of steam, within the city, and the subjection of the road to general police regulations. Looking back a little, we find that in 1840 the Orleans Navigation Company had started to build such a railroad as is thus provided for; that is to say, a road which was to extend from the corner of Toulouse and Franklin streets to the lake, and that it was prohibited from so doing by an injunction sued out by the Pontehartrain Railroad Company, on the ground that, under the charter of that company, which had still 15 years of life (expiring in 1855), it had the exclusive privilege of operating railroads to the lake. PontChartrain R. Co. v. *309 Orleans Nav. Co., 15 La. 404. It would appear, then, that the charter, and, presumably, the exclusive privilege, of the Pontehartrain Company having expired, the Carondelet Company, in 1858, concluded that it would be well to revive the abandoned enterprise of its predecessor, and it can very well be understood that it would desire to provide against the reversion to the state of the railroad, along with such property and improvements as might he included in the reversion clause of the act of 1857. In that connection the following considerations appear to us worthy of some attention. Under its charter and contract, the company was bound to make all the improvements upon the canal and bayou that were called for by “the report and plans known as Harrison’s report and plans,” except that, by the act of 1857, it was relieved of the obligation to build a basin, at the junction of the canal and the bayou, and to build a breakwater off the mouth of the bayou, in the lake. Act No. 309 of 1852, § 4; Act No. 160 of Í857, § 3. As “Harrison’s report and plans” have not been produced, we have no means of knowing what they required, hut, judging by the two improvements of which the company was thus relieved (under the act of 1857) and from the fact that the New Orleans Canal & Navigation Company had broken down in an attempt to carry them out, we should imagine that they were quite elaborate and called for a heavy expenditure of money; and the company (now in liquidation) was probably of the same opinion, since the act of 1858, admittedly “promoted” by it, contains the provision:
“Sec. 5. * * * That the said company shall have exclusive power to follow and carry out their works in conformity with such plan, or plans, as they may, at any time adopt and deem best calculated to forward the interests of commerce.”
The company, therefore, instead of being bound to carry out a scheme of improvements, perhaps elaborate and expensive, was given carte blanche, to improve the canal and bayou, or, at its option, to confine itself to the collection and enjoyment of the revenues of that property; the reference in the statute to the “interests of commerce” being negligible. Under the circumstances stated, and unless it should be conceded that the company had become the owner of the canal, bayou, and basin, the question as to what there would be to “revert” to the state was left to it to determine, and there need have been little or nothing belonging to the company to fall under the reversion clause of the statute. That being the case, the provision in the act of 1858 that “it may revert,” etc., would have been comparatively valueless to the state, and innocuous to the company, if it had not been for the provision about the railroad, the prospective reversion of which may have been regarded as worthy of the serious consideration of the promoters of the act, the more particularly as the railroad was to he built, and roads of that character usually, require something better than a prospective reversion, in order to induce the subscription required to bring them from the realms of fancy into the domain of fact.
[3] Whether this be the true solution of the problem or not, we are unable to find anything else in the act of 1858 than the railroad to which the relative “it,” as used in section 4, can in any way be made to relate. It does not relate to the “lay-outs, basins, and half moons” referred to in section 1; nor to the “fines,” which the General Assembly, in a spirit of unusual liberality, by section 7, authorized the company to impose, to be “recovered before any judge of competent jurisdiction”; nor does it apply to the bonds which, by section 8, the company was authorized to issue; nor yet to the exemption from taxation, conferred by section 9. As, however, the act of 1858 contains no repealing clause, and the act of 1857 is in pari materia, the search for the vagrant antecedent may be prosecuted in the last- *311 mentioned statute. But, in that connection it will be as well to bear in mind that we find the meaning, or possible application, of the language that we are endeavoring to interpret ambiguous and doubtful; that the concession is made (though the fact is apparent enough without it) that the instrument, or statute, containing that language was “promoted,” and, as we believe, prepared, by the defendant; that the language in question is here invoked as importing a donation, release, or gratuity, prejudicial to the state and advantageous to the promoter; and that the rule in such cases is that, where two or more interpretations are. possible, that one should be adopted which is most favorable to the party who did not create the ambiguity or doubt, and as against whom the donation, release, or gratuity is sought to be enforced, which rule, as it appears to us, is particularly applicable in this case, for the reason that a private corporation that can obtain the passage of a statute purporting to confer on it the power to impose fines upon ordinary citizens for violations of its rules, to be collected whenever a judge of competent jurisdiction is found, must be presumed to have been able to obtain all that it wanted, and is not entitled to get anything by implication or upon a doubtful construction of its grant.
The act of 1857 (No. 160), as we have stated, imposed upon the defendant corporation (thereby created) the obligation of making improvements to the channel of navigation here in question, according to “Harrison’s report and plans,” save as to one basin and a breakwater (section 3). It provided that the corporation should exist for 25 years (from October 17, 1857), at the expiration of which period the state was to have the right to take possession of the Bayou St. John, and all of the property “and improvements connected therewith,” upon paying to the corporation “the value of said property,” according to an appraisement for which provision was made. It further provided that,, should the state not elect to take possession of the property, the corporation should continue for another period of 25 years, at the expiration of which “the said property might become, absolutely, the property of the state of Louisiana, and no compensation required to be made to the corporation.”
The act of 1858, as we have seen, relieved the company of the obligation to improve according' to any other plan than such as it might choose to adopt.
It then declared:
“That the said company shall enjoy corporate succession during fifty years from this date; after which time, it may revert to the state, upon due compensation being made,” etc.
As has already been shown, being relieved of the obligation to make improvements, other than as it saw fit, it is not likely that there would have been anything of value to revert to the state, under the act of 1858, unless it should be considered that the company owned the bayou, the canal, and the basin, for the “improvement” of which puUic property the different corporations had been established.
[1] With regard to that property, it seems-to have been fairly demonstrated by the testimony adduced in cases of Orleans Navigation Co. v. Mayor, 1 Mart. (O. S.) 269; Id., 2 Mart. (O. S.) 10, 214; State v. Orleans Nav. Co., 11 Mart. (O. S.) 38, by the attitude and admissions of the company and the rulings of the court in those cases, and in the cases subsequently arising, to which the successors of the Orleans Navigation Company were parties, and by other facts and circumstances disclosed in the record that, when the Orleans Navigation Company was created, the Bayou St. John had been a navigable stream, actually used as such for the purposes of commerce during a period beyond the memory of man; that it was so used at that time, and has been so used ever since; that the Carondelet Canal was excavated under the *313 direction of the Baron de Carondelet, representing the Spanish government, mainly at the expense of the citizens of the province, who furnished three-fourths of the required labor (as against one-fourth furnished by the government), and to whom appeals were made for help in a public work, to be excavated through public land, and which was to connect the city of New Orleans, for the purposes of drainage, and later, for the purposes of navigation, with the Bayou St. John, thereby establishing a highway of navigation between the city and the lake and between the lake and the Mississippi river.
The consensus of the testimony, given by the witnesses in the case last above mentioned, was to the effect as above stated; that is to say, that, though navigation in and out of the bayou was rendered more or less difficult by the existence of a bar which had formed in the lake off the mouth of the bayou, and ‘by obstructions within the stream there were, and had always been, so far as the witnesses knew, from 30 to 50 vessels constantly engaged in such navigation from points on the north side of the lake, on Mississippi sound, and from Mobile, Pensacola, Appalachicola, and other ports and places. It was testified that vessels were built and repaired in the bayou, and “that almost all the planters on the opposite side of the lake each had a schooner, and they had no other means of communicating with New Orleans and disposing with their produce.” The navigation company, as defendant in the suit, through its counsel, admitted and contended that the act creating the company operated no alienation of the stream, or of the use of the stream, and that it was “still, and had ever been, since the company has had the charge of improving it, a public highway, free for the use of all the citizens of the United States.”
And the court, sustaining the contention of the company, as also that of the state, to the effect that the stream was a navigable highway, and, under the Ordinance of 1787, free to all citizens of the territory, and of the. United States, held that such freedom was not incompatible with regulations having for their purpose the improvement of the navigation, and imposing a charge upon those who enjoyed the benefit of such improvement; and that, though there had been no alienation of the soil,- and though the bayou had not ceased to be a “public highway,” the regulation and charge were legal and proper.
Nor, so far as any alienation or attempted alienation of the soil was concerned, could the court very well have held otherwise, since the only language in the charter of the company which purports to grant anything with reference to the Bayou St. John is that which declares' (section 9) “that, as soon as the said company shall have improved the navigation of Bayou St. John,” it shall be entitled to charge tolls proportioned to the improvement, and that it may construct roads on either side of the bayou, and charge tolls for the use of the same.
In State v. Orleans Navigation Co., 7 La. Ann. 681 (being the suit in which the charter of the company was declared forfeited, and in which the state, present plaintiff, and the company, under which the present defendant is asserting some claims, were the sole litigants), the court said:
“The Bayou St. John was a navigable stream previous to the cession of Louisiana to the United States. The Spanish Governor, the Baron de Carondelet, excavated the basin and canal to connect the navigation of the bayou with the rear of the city. * * * All its [the company’s] property, except its rights upon the basin, canal, and Ba^ou St. John have been sold. * * * The evidence in the case satisfied us that the company has not kept the navigation of the canal and bayou in the situation required by the charter. * * * The navigation which, by the improvements of near half a century, should have all the perfection of which it is susceptible is obstructed. * * * In fact, we doubt if the bar, at least, which affects the whole navigation, is in a better situ *315 ation tham, in the time of Baron de .Oarondelet.’’ (Our italics.)
What were the “rights upon the basin canal and bayou” which the company had not sold? Clearly those granted 'by its charter, to improve the navigation and collect tolls, as the improvements were made. What did the court mean in saying that the company had not “kept the navigation * ;s * in the situation required by its charter,” if the canal and bayou were not navigable when it took charge for the purpose of improving the navigation? What could have been its meaning, in expressing the doubt whether the bar “which affects the whole navigation is in a better situation than in the time of Baron de Carondelet,” save that the bar had always affected the navigation? And what greater bearing had the fact that the bar had always affected the navigation of Bayou St. John, on the question of the navigability of that stream, than has the fact that the bar off the mouth of the Mississippi affects its navigability, upon the question of the navigability of that great highway?
As' to the canal, in addition to the paragraphs from the Moniteur (a paper admitted to have been “printed under the eye of the Baron de Carondelet”), announcing the project of a canal which was to rid the city of its stagnant waters, and “in successive years will be changed into a canal of navigation for schooners,” and will have a broad banquette upon either side, planted with trees, “which will afford an agreeable promenade,” and appealing to the “zealous inhabitants” to assist in the work, there was offered in evidence, in the case of Orleans Navigation Co. v. City of New Orleans, 2 Mart. (O. S.) p. 12 et seq., the testimony of a number of witnesses among whom was “Metzinger,” who testified:
“That he was an aide de camp of the Baron de Carondelet; that he began the canal with 60 negroes, supplied by the inhabitants of the city; that in the second year the canal was widened and the work was carried on with the negroes furnished by' their owners; such individuals' as had none working themselves, or furnishing an equivalent in money. The number of negroes thus employed was, on an average after the first year, from 160 to 175. The presidios, or convicts, were about the same number, but worked only when there was no employment for them elsewhere. * * * In his judgment, the convicts did not do one-fourth of the work. * * * The witness observing that in heavy rains those waters brought so much dirt that the canal would be soon filled up, he represented this circumstance to the baron, who replied the canal was dug for the conveyance of the waters of the city, as well as for the purpose of navigation, and must answer both the intended objects.”
Boris testified:
“That the inhabitants furnished their negroes cheerfully. He dwelt at the distance of five miles from the city and sent his gang.”
Bretonnier “was employed by the Baron to solicit his neighbors to send their negroesi to work on the canal. He does not believe any of them would have sent any, if they had believed that the object was not for the benefit of the city.”
Castenado was treasurer of the city when the baron began the canal.
“His avowed object was to relieve the city from the great mortality which was occasioned by a quantity of putrid water which lodged on the commons. The inhabitants cheerfully yielded their negroes. He sent his. * * s: The general opinion of the people was that the canal would answer the purpose of a drain and of navigation.”
In the case to which we are thus referring, the court decided (in favor of the navigation company) that, whilst the canal had been dug for the double purpose of drainage and navigation, the time had arrived when the two uses were incompatible, and that the canal should thereafter be used solely for the purpose of navigation.
In the suit in which the charter of the company was declared forfeited (State v. Orleans Nav. Co., 7 La. Ann. 681), the court said:
“The Spanish Governor, the Baron de Carondelet, excavated the basin and canal to connect the navigation of the bayou with the rear of the city.”
*317 In City of New Orleans v. Carondelet Canal & Navigation Co., 36 La. Ann. 397, the company (defendant there and defendant here) resisted the demand of the city for the payment of a tax on its capital stock, and the court, sustaining its contention, said:
“The defendant corporation was created in 1857 (Act No. 160) and acquired the right, power, and authority to enter upon and take possession and control of the Canal Carondelet and Bayou St. John, for the purpose of completing the works and improvements thereon, and other privileges.”
It then refers to the clause in the act of 1858, exempting the “canal and railroad” from taxation, and holds that “the canal was state property, and, of course, necessarily exempt,” and that the exemption granted by the statute applied to the capital stock of the company.
In Carondelet Canal & Navigation Co. v. City, 44 La. Ann. 396, 10 South. 871:
“The collection of the tax was being enforced by seizure and sale [of a lot of ground near the Bayou St. John] when an injunction was sued out, on the grounds that plaintiffs are the lessees of said property and are entitled to the franchises of its predecessor, the Orleans Navigation Company, and the property, being owned by the state, will revert to the state at the expiration of its charter, and the Canal Carondelet was known as the work of the Spanish Governor whose name it bears. As public property, it became a part of the public domain, at the cession of Louisiana. In 1805, the territorial Legislature incorporated the ‘Orleans Navigation Company,’ and made it the duty of, and gave the authority to, that company to improve the canal and bayou. * * * The land on which the tax is claimed, plaintiff admits in its petition and in its brief, belongs to the state. It was donated by Congress on April 14, 1814.”
In the case of Wheelock et al. v. St. Louis & San Francisco Railroad Co. (no written opinion) No. 13,244 of the docket of the U. S. Circuit Court, it was shown (as we have seen in the statement which precedes this opinion) that the defendant, railroad company, owned a majority of the stock of the canal company; that the railroad company was seeking to acquire certain property of which the canal company was in possession, and to which its board of directors (nominated by the railroad company) declined to assert title, on the ground that it belonged-to the state of Louisiana, as connected with the canal; that thereupon the suit was brought by certain minority stockholders of the canal company, complaining that they were not getting fair treatment.
The report of the special master in the case sustained the position taken by the railroad company that, as the holder of the majority of the stock of the canal company, it could find no ground upon which to assert the title of that company or to deny the title of the state to the property which it (in its capacity as railroad company) was seeking to acquire. The same majority stockholders of the canal company, as we understand the situation, are now represented by the defendant liquidators in the contention that the canal, and all the property connected therewith, belongs, not to the state, but to the canal company. From the evidence, from the judicial admissions of the defendant and its predecessors, and from the rulings of the courts, in litigations to which defendant and its predecessors were parties, therefore we conclude that the Bayou St. John has always been a navigable stream, and, with the Carondelet Canal and basin, and the property connected therewith, has always been property, the title to which has been held by the government, for the use of the public. As a navigable stream, the Bayou St. John was inalienable, under the Ordinance of 1787, agreeably to the provision of which Louisiana was admitted into the Union as a state. As public property, created at the expense of the citizens of the province, who bore that expense upon the faith of the representations of the government that it would be dedicated to their use, the canal was also inalienable, unless we are willing to concede that a government is bound by no considerations of honor or good faith. And if, upon the completion of the *319 canal, the Baron de Carondelet, or the Spanish government, which he represented, could not honorably or legally have conveyed the canal to a private individual or corporation, to the prejudice of those at whose expense it had been constructed, neither could the government of the United States, as the successor of the Spanish government, and neither could the state of Louisiana, as the successor of the United States, by any right of dominion acquired in that capacity over the navigable streams and public highways within her territory. We do not find, however, that either of the governments mentioned has made any attempt to alienate the property here in question, or that the defendant has ever acted under the belief that there had been such alienation. It is thought that, in the notarial act of conveyance frojn Halsey, liquidator, to Currie, there is some -language used which has the appearance of an attempt of that kind; but Halsey could not convey more than he had, and the grantee of Currie, the New Orleans Canal & Navigation Company and its grantee, the present defendant, seem to have been aware of that principle, since the present defendant acquired only the interest of its grantor in the property. The legislative acts of 1852 and 1858, relied on by defendant, assume as a fact (that which no one, we think, could reasonably deny) that the bayou, the' canal, the basin, and all that constituted what may be called the thing, the plant, the highway of commerce, known as the “Bayou St. John and Carondelet Canal,” was property held by the state, for the use of the public, just as the streets and thoroughfares of the city of New Orleans were held, and the references in those acts to “property and improvements” which were to revert to the state related, and could relate, as to the title, only to such property and improvements as the different corporations were expected to add to that which, the title being already vested in the state, for the use of the public, could not revert to the state.
These being our conclusions with reference to the status of the Bayou St. John and the Canal Carondelet, we can find nothing in the act of 1857 to which the. word “it,” as used in the act of 1858, could reasonably, or otherwise, be held to relate, and we are obliged to fall back upon the solution that it was intended to relate to the railroad provided for in the preceding section of the same act, and which, having never been built, can afford no basis for defendant’s demand for compensation and for a continuance of its possession of public property.
The property acquired in the name of the Orleans Navigation Company (or New Orleans Navigation Company, or Company of Navigation of New Orleans), as described in the record, was, for the most part, so acquired by titles which fix its destination irrevocably as a part or appurtenance of, or as connected with, the property which that company was administering, for the benefit of the public; but, even if or when that were not the case, where the property acquired was by the company made a part, or appurtenance, or improvement of, or was connected with, the property so administered, and occupied that relation at the date of the expiration of the defendant’s charter, in March, 1908, the result, for the purposes of this suit, is the same, since, under the act of 1857 (No. 160, § 20), unrepealed by Act No. 74 of 1858, the state is entitled “to take possession of said Canal Carondelet and Bayou St. John and all the property and improvements connected therewith.” The company may, of course, own property which was not at that or at any previous time connected with the Bayou St. John and Carondelet Canal, and to which the state has therefore no claim, under the allegations of the petition in this suit As to the $3,000, deposited in the Hibernia Bank & Trust Company, *321 herein in dispute, the evidence in the record is insufficient to enable us now to determine to whom it belongs, and we are of opinion that the question of its ownership should be made the subject of further investigation.
It is therefore ordered, adjudged, and decreed that the judgment' appealed from be annulled, avoided, and reversed, and that there now be judgment in favor of the plaintiff, the state of Louisiana, and against the defendant, the Carondelet Canal & Navigation Company, in liquidation, herein represented by A. J. Davidson, J. H. Elliott, and Hans Widner, it's liquidators, decreeing that the Carondelet Canal, Bayou St. John, and Old Basin, together with all the property and improvements connected therewith or thereto appertaining or belonging, be delivered to, and into the possession and control of, said state of Louisiana, t'o be managed and administered by it, for the use of the public, through the board of control for the Bayou St. John and Carondelet Canal and Old Basin, appointed by the Governor, pursuant to the provisions of Act No. 161 of 1906, and that the same be so delivered, free from any obligation on the part of the state to pay or compensate the said defendant therefor, or for any part' thereof.
It is further adjudged and decreed that said defendant and said liquidators render an accounting, showing their receipts and disbursements, in the management of the said property, since March 10, 1908.
It is further decreed that this case be remanded to the district court' for further investigation, upon the lines indicated by the foregoing opinion, unto the question of the ownership of the $3,000, now on deposit in the Hibernia Bank & Trust Company; that the right of the plaintiff, to obtain judgment- for such amount as may be found due upon defendant’s accounting and t'o take such further proceedings and obtain such further orders as may be required for the execution of this judgment, be reserved.
It is further decreed that defendant pay all costs.